PRAIRIE DU CHIEN-MARQUETTE BRIDGE CO. V. COMMISSIONER.
PRAIRIE DU CHIEN-MARQUETTE BRIDGE CO. v. COMMISSIONER
DOCKET NO. 109314.
United States Tax Court
1943 Tax Ct. Memo LEXIS 449; 1 T.C.M. (CCH) 598; T.C.M. (RIA) 43082; February 13, 1943
*449 Reorganization: Bondholders of predecessor corporation purchasing asset of predecessor for new corporation: Basis for depreciation. - The bondholders of a bridge company in bankruptcy purchased for $170,000, the sole asset of such company at a public sale at which they were allowed to use the bonds in the payment of the purchase price. A new corporation was formed in which the bondholders received proportionate shares of stock. The Tax Court holds that there was no "reorganization" under Sec. 112 (g) (1) (C), 1934 Act, since the stock ownership control resulting from the reorganization was acquired by virtue of the ownership of the bonds and not by ownership of the stock of the predecessor. Consequently, the taxpayer was not allowed to base its depreciation on the property on the cost of the property to the predecessor. Nor does the evidence support a finding of fair market value for the property at any time. Therefore the Commissioner's basis of the property, $200,000, must be accepted. H. E. McCamey, Esq., 2415 Grant Bldg., Pittsburgh, Pa., for the petitioner. Wm. A. Schmitt, Esq., for the respondent. LEECH Memorandum Findings of Fact and Opinion LEECH, Judge: Respondent determined *450 deficiencies against petitioner as follows: Income tax: Fiscal year ended June 30, 1937
$1,147.61
Fiscal year ended June 30, 1938
430.63
Excess-profits tax: Fiscal year ended June 30, 1938
83.51
The only issue submitted is whether respondent erred in disallowing, as excessive depreciation, $9,000 claimed on the return of the petitioner for the first fiscal year and $4,000, for the second fiscal year. The proceeding was submitted on a stipulation, together with documentary evidence. The stipulated facts are found, as stipulated. [The Facts] Petitioner is a Delaware corporation, organized February 10, 1934, and filed its income and excess-profits tax returns for the years involved with the collector of internal revenue for the Twenty-third District of Pennsylvania. The Prairie du Chien Bridge Company (hereinafter called the "Bridge Company") was a Delaware corporation organized on May 10, 1930, and was licensed to do business in the State of Wisconsin on January 13, 1931. This company acquired by assignment from other persons a franchise to construct and maintain a bridge across the Mississippi River at or near Prairie du Chien, Wisconsin. After various parties *451 had expended substantial sums on the construction of the bridge, financing became impossible and, on September 10, 1931, the Bridge Company entered into a contract with F. K. Ketler Company, Inc., Chicago Bank of Commerce, and Pittsburgh-Des Moines Steel Company (hereinafter called the "Steel Company"), a copartnership composed of W. H. Jackson, Ruth H. Jackson and George A. Smith, under the terms of which the Steel Company agreed to and did complete the bridge on March 7, 1932, since which it has been operated continuously as a toll bridge. It consists of two spans across separate sections of the Mississippi River, and cost the Bridge Company $777,487.25. This bridge was practically the only asset of the Bridge Company. In part payment for the work performed by the Steel Company, it had received first mortgage 6 1/2 per cent sinking fund bonds in the face amount of $275,100, together with all of the issued capital stock of the Bridge Company, amounting to 10 shares. On December 31, 1932, the Bridge Company owed liabiliities as follows: First Mortgage 6 1/2% S. F. Bonds
$350,000.00
Accrued interest thereon due and un-
paid
14,348.75
Debenture 7% Bonds
270,000.00
Accrued interest due and unpaid
9,828.92
Notes payable
3,312.68
Accounts payable and other small
liabilities
205,281.18
*452 The greater part, at least, of the last four items was owed to the Steel Company. The Bridge Company had defaulted on a payment of its interest on its first mortgage bonds subsequent to June 15, 1932 and, on January 16, 1933, upon the resolution of its board of directors, the Bridge Company filed a voluntary petition in bankruptcy and was, on January 18, 1933, adjudged a bankrupt. On December 4, 1933, after prior conferences with Bartlett & Gordon, securities dealers in Chicago, Illinois, who represented owners of first mortgage bonds of the Bridge Company in the face amount of $69,200, W. H. Jackson, on behalf of the Steel Company, submitted to Bartlett & Gordon the following proposal which was accepted by the latter firm: I together with clients of your office are the owners of a substantial amount of First Mortgage 6 1/2% Sinking Fund Gold Bonds of Prairie du Chien Bridge Company, which company is now in bankruptcy. The trustee in bankruptcy has filed a petition for the sale of the property of said company, including that property subject to the lien securing the above mentioned bonds. It is agreed as follows: 1. You will form or cause to be formed a corporation incorporated *453 under the laws of such state as shall be mutually agreeable to us, which corporation shall have adequate power to own and operate the bridge now belonging to the Prairie du Chien Bridge Company, and shall have an authorized capital stock adequate for the distribution hereinafter specified. All matters connected with such corporation not herein specifically provided for shall be subject to my approval and all legalities in connection with the formation of such corporation, the issuance of its stock, and other matters herein provided for, shall be subject to the approval of my counsel, Cutting, Moore & Sidley. 2. You will endeavor to bring about the exchange of the bonds of the Prairie du Chien Bridge Company held by your clients for the securities of the new company, on the following basis: (a) Bonds of the new company of a par value equal to fifty per cent (50%) of the indebtedness represented by the bonds and coupons of the Prairie du Chien Bridge Company held by such clients. (b) One share of preferred stock of said new company for each $100 of the remaining fifty per cent (50%) of such indebtedness. (c) One share of common stock for each $100 of said indebtedness. 3. I shall *454 bid at such sale such sum as shall seem to me advisable, and in case I shall acquire said property free and clear of all liens I shall cause the property to be conveyed by quitclaim deed to said company in exchange for the following securities to be issued by it: (a) A short term note bearing interest at the rate of six per cent (6%) per annum, equal in principal amount to the amount of money paid by me in cash in connection with such sale in bankruptcy in order to acquire the mortgaged property, whether such money be paid for the purpose of meeting expenses incident to such sale or to cover the proportion of the purchase price payable to such of the bondholders as shall not exchange the bonds now held by them upon the basis hereinabove set forth. (b) Bonds of the new company of a par value equal to fifty per cent (50%) of the indebtedness represented by the bonds and coupons of the Prairie du Chien Bridge Company held by me. (c) One share of preferred stock of said new company for each $100 of the remaining fifty per cent (50%) of such indebtedness. (d) One share of common stock for each $100 of said indebtedness. 4. Said bonds to be issued by said new company shall be Twenty-Year *455 Bonds and shall bear interest at the rate of six and one-half per cent (6 1/2%) per annum. The preferred stock of said company shall be redeemable at $100 per share and shall bear cumulative dividends at the rate of six and one-half per cent (6 1/2%) per annum. 5. In case said property shall be sold subject to liens and I shall acquire the same, then we both will cooperate in order to bring about the same result through other means. The foregoing is intended as a mere memorandum of our ultimate intention, and the details shall have to be worked out mutually agreeable to both of us. On December 5, 1933, the bankruptcy court authorized the sale of the bridge property free and clear of all liens and encumbrances, upon the petition of the trustee in bankruptcy and of the Steel Company, and provided that the first mortgage bonds of the Bridge Company could be used in payment of the selling price thereof. On January 4, 1934, such sale was regularly and publicly made to W. H. Jackson at his bid price of $170,000. He was the only bidder and the bid was made by him pursuant to the agreement between him, as a representative of the Steel Company, and Bartlett & Gordon, representing other *456 bondholders. On January 11, 1934, this sale was confirmed by the bankruptcy court. The payment of this bid price was made as follows: Payments endorsed on $275,100 par
value of First Mortgage Bonds
owned by Pittsburgh-Des Moines
Steel Company, and defaulted coupons, with accrued interest
to December 5, 1933, amounting to $32,873.17
$132,330.38
Cash for payments on $74,900 par
value of First Mortgage Bonds
held by others, and defaulted
coupons, with accrued interest
to December 5, 1933, amounting to
$4,849.50
34,269.62
Cash for Trustee's and Referee's fees
3,400.00
$170,000.00
Pursuant to the agreement of December 4, petitioner was organized on February 10, 1934, and on February 14, 1934, W. H. Jackson and his wife executed a quit-claim deed for the property, formerly owned by the Bridge Company, to petitioner, which deed was delivered to petitioner on July 18, 1934. Contemporaneously with this delivery, securities of petitioner were exchanged for bonds in the Bridge Company pursuant to the agreement of December 4, 1932, as follows: Shares
Shares
Par Value
Differential
Comm.
Pfd.
1st Mtge.
Paid
Stock
Stock
Bonds
in Cash
$275,100 par value of Prairie du Chien Bridge
Co. First Mortgage Bonds held by
Pittsburgh-Des Moines Steel Co.
and accrued interest were exchanged for
1536 1/2
1536 1/2
$153,600
$ 41.25
$58,400 par value of said First Mortgage Bonds
owned by clients of Bartlett & Gordon, Inc.
and accrued interest were exchanged for
321
321
29,100
428.61
*457 The stock of petitioner so issued comprises all of its stock that has ever been issued except 197 shares which were issued on August 17, 1934 to nominees of the Steel Company for their advances, and bonds, thus issued were all of the bonds that have ever been issued by petitioner except bonds which were later issued to W. H. Jackson for money advanced to the petitioner. The sum of $26,711.87 was received by petitioner from the trustee in bankruptcy upon the surrender to the trustee of $58,400 par value of the first mortgage bonds of the Bridge Company, together with coupons covering the accrued interest thereon, which bonds had been turned over to the petitioner by the clients of Bartlett & Gordon for exchange for the bonds and stock of the petitioner pursuant to the agreement of December 4. Opinion The respondent disallowed the contested items of depreciation with the following comment in the deficiency notice: (a) It has been held that the transaction whereby you acquired the property formerly owned by the Prairie du Chien-Marquette Bridge Company did not constitute a reorganization and that the basis to be used in computing depreciation thereon is $200,000.00, the fair market *458 value of the property at the time acquired by you. The petitioner attacks this disallowance upon three grounds: (1) the transaction in which the petitioner acquired the properties formerly of the Bridge Company was a reorganization under section 112 (g) (1) (C) of the Revenue Act of 1934; no gain or loss on the transaction was therefore recognized under section 112 (b) (3) and the basis of petitioner for the computation of its depreciation, under section 113, would therefore be the cost of the bridge property to the Bridge Company, subject to a proper depreciation allowance; (2) if such transaction was not a reorganization under section 112 (g) (1) (C), it was within the purview of section 112 (b) (5), [1] and the basis for the computation of depreciation to petitioner would be the fair market value of the bridge property at the time the bondholders acquired their equity in such property, properly depreciated; and (3) if such transaction is not a reorganization under section 112 (g) (1) (C) nor a transfer within the purview of section 112 (b) (5), then the basis for the computation of the contested depreciation of the property in the hands of the petitioner was the fair market value *459 of the bridge property at the time it was acquired by petitioner in 1934, or $727,049.88, properly depreciated. The first position of the petitioner is based on the premise, the existence of which is apparently admitted, that the sole stockholder of the Bridge Company was in "control" of petitioner immediately after its acquisition of the bridge property. Section 112 (h). See ; ; . *460 However, the stock ownership constituting that control was acquired by virtue of ownership of the bonds of the Bridge Company - not its stock. That fact, in substantially identical circumstances, we have expressly ruled, excludes the transaction as a reorganization under section 112 (g) (1) (C). , (see particularly page 883); pet. for rev. dismsd., Fed. (2d) , (Dec. 15, 1942). Upon the authority of that case, we hold against petitioner on its first contention. As to the second position of the petitioner, assuming without deciding that the acquisition of the bridge property by petitioner was within the purview of section 112 (b) (5), supra, (see Helvering v. Cement Investors, Inc., et al., supra;), does the record disclose the fair market value of the bridge property at the time the interest of the bondholders of the Bridge Company, as such, matured into equitable interests in the properties of that company which were conveyed to the petitioner? We think it does not. It is true that the stipulation *461 contains the following: (15) Without the respondent admitting the truthfulness of the same, it is stipulated that the following averments shall be made a part of the record, the same as if N. T. Veatch, Jr. of Black & Veatch, consulting engineers, Kansas City, Missouri, were present at the time of the trial of this case and testified as follows: 1. That his experience in appraising is shown by pamphlet offered in evidence and marked Exhibit "III." 2. That in 1939 he appraised this bridge and made certain findings all of which are in a report offered in evidence and marked Exhibit "V." 3. That the fair market value of the bridge on March 7, 1932 was the same as that certified to by the Secretary of War, to wit, $727,049.88 and that the fair market value of the bridge at any particular period thereafter was that sum less the reasonable annual depreciation. In considering this evidence we pass the significant facts that the Bridge Company, the sole asset of which was the property with which we are here concerned, became a voluntary bankrupt in January 1933 and that the property was sold at a public sale in bankruptcy in January 1934 for $170,000 which the Federal Court in approving *462 the sale said was "Seventy-five per cent of the appraised value" of the property. Assuming sufficiency of the qualifications of Veatch as an expert witness on the question of fair market value, what do we find here? The 1939 appraisal of the firm of which Veatch was a member, which was one of the two bases upon which their opinion of prior fair market value was supported, was not an appraisal of the fair market value of the bridge at any time. It was merely "an estimate [as of September 4, 1939] of the cost of reproducing the property at present day prices of material and labor" and "the amount of accrued depreciation, or the loss in value due to wear and tear, effect of the elements, and any other causes for diminution of the physical value". The other support for this opinion as to fair market value of the bridge property by these engineers was a certificate by the Secretary of War. But that certificate was not one having to do with fair market value but was "the actual and reasonable cost of constructing, financing and promoting" the bridge. Since neither original nor reproduction costs measure fair market value, little if any weight can be given to this testimony. . *463 An opinion must be weighed by the reasoning that supports it. See . It is therefore held that this evidence does not support a finding of fair market value for the bridge property at any time. It follows that this record does not establish that the figure of $200,000, used by respondent as the basis of the property to petitioner when acquired, was wrong. This discussion renders unnecessary any comment on petitioner's third position. We conclude that petitioner has failed to establish error in the determination of the respondent. Decision will be entered for the respondent. Footnotes
1. SEC. 112. RECOGNITION OF GAIN OR LOSS. (b) Exchanges Solely in Kind. - (5) Transfer to Corporation Controlled by Transferor. - No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation; but in the case of an exchange by two or more persons this paragraph shall apply only if the amount of the stock and securities received by each is substantially in proportion to his interest in the property prior to the exchange.↩